UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>DARRYL JONES AND GREGORY<br>AIRVURTIS WALKER,<br><br>            Defendants. | Case No.  19-cr-00013-SI-1<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTIONS TO SUPPRESS**<br><br>Re: Dkt. Nos. 54, 55 |

On January 14, 2020, the Court held a hearing on defendants' motions to suppress.  At the hearing, the government requested leave to file supplemental briefing regarding whether defendant Darryl Jones had a reasonable expectation of privacy in the rental car.  The government filed a supplemental brief on January 19, and defendant Jones filed a response on January 28, 2019.  After careful consideration of the parties' arguments and the record before the Court, the Court GRANTS defendants' motions to suppress.

**BACKGROUND**[1]

I.     **Alleged traffic violation**

On Tuesday, January 9, 2018, at approximately 12:40 a.m., defendants Darryl Jones and Gregory Walker were driving a white Ford Fusion in the Marina District of San Francisco.[2]  Jones

---

[1] The following facts are taken from the parties' exhibits and declarations, including but not limited to the declarations of defendant Darryl Jones, the declaration of Gina Huddleston, the declaration of San Francisco Police Department Officer Robert Glenn, incident reports prepared by Officers Glenn and Roberts, and the officers' "body cam" video footage.

[2] Defendants cite a report by the San Francisco Planning Department for the proposition that the Marina is the least ethnically diverse neighborhood in San Francisco.  The government does

and Walker are cousins, and they are black.  Jones was driving, and Walker was in the front passenger seat.  The Ford Fusion was a rental car that had been rented by Walker's mother, Gina Huddleston, in her name.  Huddleston Decl. ¶¶ 1-2 (Dkt. No. 67-1).  Ms. Huddleston gave her son, Walker, permission to drive the car, and Walker gave Jones permission to drive the car.  *Id.* ¶ 3; Supp. Jones Decl. ¶ 3 (Dkt. No. 74).[3]

Jones states in his declaration,

2.  As I was driving on Franklin Street, I drove past a SFPD patrol car, which was stopped at a red light on a side street of Franklin.

3.  In my rear view mirror, I saw the patrol car run a red light to turn onto Franklin Street behind my car.

4.  In my rear view mirror, I saw the patrol car follow me for several blocks.[4]  Finally, we stopped at a red light at the Lombard Street intersection.  The patrol car pulled up to the lane on my right side.

Jones Decl. ¶¶ 2-4 (Dkt. No. 54-2).

San Francisco Police Department Officers Robert Glenn and Trevor Roberts were on uniformed patrol, and they were in the patrol car that pulled up next to defendants' vehicle.  Officer Glenn, who was driving, wrote in his Incident Report that when their patrol car was parallel to the Ford Fusion, "I looked over and made eye contact with the occupants . . . driver Darryl Jones and . . . passenger Gregory Walker whom immediately looked away from me."  Incident Report at USA-

---

not address (or dispute) that assertion.  According to the report, the ethnic breakdown of the Marina neighborhood is as follows:  Asian 11%, Black/African-American 1%, White 83%, Native American Indian 0.1%, Native Hawaiian/Pacific Islander 0.1%, Other/Two or More Races 4%, Latino (of Any Race) 6%.  *See* San Francisco Neighborhoods, Socio-Economic Profiles: American Community Survey 2010-2014, San Francisco Planning Department (March 2017), at 40; available at  https://default.sfplanning.org/publications_reports/SF_NGBD_SocioEconomic_Profiles/2010-2014_ACS_Profile _Neighborhoods_v3AH.pdf.

[3] Jones states in his supplemental declaration that on January 9, 2018, Walker picked him up in the Ford Fusion and that they drove to a gas station.  Supp. Jones Decl. ¶¶ 1-2.  According to Jones, while they were at the gas station, Walker said he was tired and he asked Jones to drive.  *Id.* at ¶ 3.  Jones states that Walker gave him permission to drive.  *Id.*; *see also* Krishnamurthy Decl., Ex. C at 18:00-23:25 (audio recording of police station interview with Walker in which Walker told police officers that he had given Jones the car and that they were driving to get some pizza when they were stopped by the police.  Walker told the police that Jones was supposed to drive Walker to work for a shift that started at 2:30 a.m.).

[4] Defendants assert that the patrol car tailed them for several blocks.  The government does not dispute that assertion.

000029 (Dkt. No. 63-1).

The intersection of Franklin Street and Lombard Street has two left-turn lanes; defendants' vehicle was in the inner left-turn lane, and the officers' car was in the outer left-turn lane. Both vehicles turned left onto Lombard Street. After turning left onto Lombard, Jones braked to allow the SFPD patrol car to pass him on the right, and then he merged three lanes over and pulled into the parking lot of the Redwood Inn at 1530 Lombard Street. Jones describes what happened as follows:

> 6. Shortly after turning onto Lombard Street, I saw a hotel called the Redwood Inn on the right side of the street. I looked in my rear view mirror to see if any cars were behind me. There were not; only the SFPD patrol car to my right.
>
> 7. I braked to allow the SFPD car to pass me on the right side, and then I turned on my blinker, merged three lanes over, and pulled into the Redwood Inn parking lot at 1530 Lombard Street.
>
> 8. After I pulled into the parking lot, I turned my vehicle around and began to back into a parking space.
>
> 9. After I backed in, I saw the same SFPD patrol car pull up across the entrance way of the hotel parking lot with its lights on. Because the car was parked in front of the entrance, blocking the only exit, I could not drive away from the lot.

Jones Decl. ¶¶ 6-9.

Officer Glenn's Incident Report states:

> As we got on to Lombard Street, the Ford came to a stop in the number one lane and began to turn right narrowly missing my vehicle. This turning movement made the vehicle behind us slam on their brakes and honk their horn (in violation of 22107(a) CVC).[5] The Ford crossed three lanes of traffic and pulled into the parking lot of 1530 Lombard Street. I was unable to safely maneuver my vehicle to effect a traffic stop on the vehicle. I made a lap around the block and waited facing south on Franklin Street at the intersection of Lombard Street to see if the vehicle was going to pull out of 1530 Lombard Street. As I was waiting I saw the vehicle start to pull onto Lombard Street from the parking lot. I pulled my vehicle to westbound Lombard Street so that I could effect a traffic stop on the Ford. As I turned onto Lombard Street I saw the driver Jones look in my direction. The Ford reversed back into the parking lot into a disabled parking spot.
>
> I saw that the Hotel employee Victor was looking at the car and then at Officer Roberts and me. I approached Victor and he stated that he saw the vehicle pull into

---

[5] California Vehicle Code section 22107 provides, "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement." Cal. Veh. Code § 22107.

the parking lot and then he saw that the vehicle was going to leave but when the vehicle saw our police car they reversed into a parking spot. Victor stated that he was unsure if they were hotel guests.[6]

Incident Report at USA-000029.

## II.    Officer Glenn's interactions with Walker

While Officer Glenn was talking to the hotel employee Victor, Walker exited the vehicle.[7] Jones Decl. ¶ 10; Glenn's Incident Report at USA-000029. According to Officer Glenn's Incident Report, Glenn asked Walker what he and Jones were doing, and Walker stated that they were looking for a friend who was staying at the hotel. Glenn's Incident Report at USA-000029. Approximately 30 seconds into Officer Glenn's body cam footage, Officer Glenn asked for Walker's identification and subjected him to a pat-down search, which did not reveal any weapons or contraband. Mitchell Decl., Ex. B at 00:36. Walker then said, ". . . they didn't text me the address, but they right here," presumably referring to the friend(s) he had said he and Jones were visiting at the hotel. *Id.* at 00:44-00:48. Officer Glenn asked Walker if he knew the address of the hotel (Walker did not), and then Glenn told Walker to sit down on some stairs located to the right of the hotel lobby "so we can figure out what's going on." *Id.* at 00:49-00:58. Officer Glenn then asked Officer Roberts whether he had obtained Jones' identification yet, and he told Roberts to have Jones turn the car off. *Id.* at 01:05-01:10.

Officer Glenn then contacted dispatch and provided the address of the hotel, the license plate number of the Ford Fusion, and Walker's information for a records check. *Id.* at 01:28-02:27.[8]

---

[6]    Defendants assert that the hotel employee Victor did not ask the officers to investigate defendants, noting that the Incident Reports do not state that Victor asked for help. The government does not contend that Victor asked the officers to investigate.

[7]    Officer Glenn turned on his body cam at some point prior to Walker exiting the vehicle. Officer Glenn's body cam footage, which was filed by both parties, begins with Officer Glenn facing Walker while he is standing some distance in front of the Ford Fusion in the hotel parking lot. The first 30 seconds of the footage does not contain audio. Officer Glenn's body cam footage does not include his initial interaction with Victor, the hotel employee. Officer Glenn's body cam footage is found at Mitchell Decl., Ex. B & Krishnamurthy Decl., Ex. 2.

[8]    At the hearing, the Court asked the government what kind of check was run on Walker, and the government's counsel stated that criminal history records checks were run on both defendants. The government's counsel also stated that the records check on Walker did not reveal his federal custodial status, discussed *infra*.

Approximately two and a half minutes into Officer Glenn's body cam footage, Officer Glenn told Walker, "So, being straight up with you man, it looks a little weird when we're stopped next to you guys, you guys cut across three lanes then pull into here. And then we come around the corner, and you guys were trying to pull out." *Id.* at 02:28-02:37. Walker responded (what he said is indecipherable on the body cam footage), and Glenn continued, "You know what I mean? Like, from my position, right, that seems like, a little weird for me. And then we come and the manager's standing out here and he's staring at us and then staring at you and staring at us and staring at you, [laughing] so, that's why we pulled in, and he's like 'these people, they pulled in, they pulled out,' so that's why we're talking to you guys, we're trying to figure out what's going on, make sure everything's on the up and up. If it ain't nothing, it ain't nothing. We'll get out of your guys' hair." *Id.* at 02:37-02:58. Officer Glenn then spoke to Officer Roberts and Jones, who are both off camera, and said that Jones could step out of the car "if he wants, if he's nervous about something." *Id.* at 03:03. During this entire colloquy, Officer Glenn did not mention a traffic violation as the reason for the stop, nor did he mention anything about smelling marijuana.

Approximately four minutes into Officer Glenn's body cam footage, Officer Glenn asked Walker, "How much weed do you guys have in the car?" *Id.* 04:06. At the time Officer Glenn asked this question, he was standing close to Walker, who was still sitting on the steps.[9] Walker stated that there was none. Officer Glenn responded, "Nothing? Nothing? That's good. I like that." *Id.* at 04:14. Glenn then asked, "What have you been arrested for in the past?" *Id.* at 04:15-17. Walker answered, stating he had been arrested for possession of a firearm, and then Glenn continued to question Walker, asking if there were any other arrests and whether the possession charge had been discharged (Walker said it had). *Id.* at 04:18-04:44. Throughout this questioning, Walker continued to sit on the hotel stairs. Officer Glenn then informed Walker that Jones was on

---

[9] Defendants assert that at the time Officer Glenn asked this question, he was standing nearly 20 feet from the vehicle. Def. Jones' Mtn. at 4 (Dkt. No. 54). The government does not dispute this assertion. Based upon the Court's review of the officers' body cam footage, it is difficult to measure the precise distance between where Officer Glenn is standing and the vehicle, although it is clear that Officer Glenn is standing some distance in front of the vehicle and is not right next to the vehicle.

probation and that he did not have a valid driver's license, and that Walker's driver's license was valid. *Id*. at 04:50-05:54.

Approximately four minutes into Officer Glenn's body cam footage, Officer Glenn said, "If there ain't nothing in the car to worry about, there ain't nothing in the car to worry about, right? So if you guys are being on the up and up with us, it's gonna be all good. But if you're not, it's better to tell me now than later. You know what I mean?" *Id*. at 06:00-06:12. Walker responded with, "Yeah." *Id.*

### III.    Officer Roberts' interactions with Jones

While Officer Glenn was questioning Walker, Officer Roberts exited the patrol car to question Jones, who was sitting in the driver's seat of the Ford Fusion. Mitchell Decl. Ex. C (Officer Robert's body cam footage).[10] Officer Roberts stood by the driver's side and requested Jones' license and registration. *Id*. at 00:00-01:00. Roberts contacted dispatch and provided Jones' information for a records check. *Id*. at 01:26. Jones, apparently responding to hearing Officer Glenn say to Walker that "it looks a little weird when we're stopped next to you . . . " said, "We was trying to pull into the hotel, and y'all was just, y'all . . . we put on our blinkers and everything." *Id*. at 01:27. Officer Roberts responded, "Okay, well, then it was the manager that was a little off-put by it all too." *Id*. at 01:28-01:33. Jones then placed his hands outside the driver's side window, and after Officer Glenn said that Jones could step out of the car if he was nervous, Jones said, "No, I'm not nervous. I just don't want y'all to be nervous. I'm Gucci." *Id*. at 01:50-01:56.[11]

Jones continued to sit in the car while Officer Roberts stood next to the car, and after another minute, Jones asked, "We didn't break the law though or nothing, did we?" *Id*. at 02:56. Roberts

---

[10] As with Officer Glenn's body cam footage, there is no audio until approximately 30 seconds in. It appears to the Court based upon comparison of the same events (e.g., Officer Glenn calling dispatch to provide Walker's information, which can also be heard on Roberts' body cam footage), that Officer Glenn's body camera footage started approximately one minute and ten seconds before Roberts' footage began.

[11] The Court is informed that, when used as slang, "Gucci" is defined as "A versatile slang term based on the luxury fashion brand meaning okay/good/great/awesome/fresh/etc." www.urbandictionary.com/define.php?term=Gucci.

responded, "We're just trying to make sure everything's good. If everything's good, you'll be on your way and we'll be on our way. . . . If there's nothing going on, you don't got to be nervous." *Id*. at 03:01-03:07. Officer Roberts said, "Like I said, the manager was just a little off-put, I don't know if he got a little spooked or whatever, but he asked us to check it out, and we're just here checking it out." *Id*. at 03:21-03:28.[12] At no point did Officer Roberts mention anything about an alleged traffic violation, nor did he ask Jones about marijuana: he did not ask him if there was any marijuana in the vehicle; did not ask him if he had been smoking marijuana; and he did not conduct a field sobriety test.

Officer Roberts then asked Jones why he was on probation, and Jones denied being on probation.[13] *Id.* at 03:55. Roberts then told Jones to get out of the car and to join Walker on the stairs. *Id*. at 04:18. After Jones exited the vehicle, Roberts told Jones to put his hands on his head and to turn around, and Jones asked if he was going to jail. *Id.* at 04:23. Roberts said "No, no, not right now, not if nothing's going on. . . . Like I said man, if nothing's going on, you don't need to be nervous." Officer Roberts proceeded to pat Jones down, and said "I'm just checking you to make sure you don't got any weapons right now, okay" *Id.* at 04:35.[14] Roberts searched Jones and did not find any weapons.

### IV.     Search of the vehicle

After Jones joined Walker on the steps, Officer Glenn questioned Jones about whether he was on probation, while Officer Roberts stood nearby. Mitchell Decl., Ex. B at 06:38. Jones stated that he had already completed his probation, and Officer Glenn said that he would double check.

---

[12] As noted *supra*, defendants assert that Victor did not ask the officers to investigate.

[13] Jones asserts – and the government does not dispute – that on January 9, 2018, Jones was no longer on probation and that the information the officers received about Jones still being on probation was incorrect. Jones cites Mitchell Decl., Ex. F (San Francisco Police Department Criminal History Check for Jones) as evidence that Jones was no longer on probation at the time of the stop and search.

[14] Defendants note that on the video, Officer Roberts states that he is checking Jones for weapons, and he does not mention marijuana. However, Officer Glenn's Incident Report states that "Officer Roberts had Jones exit the vehicle and conducted a search of his person for marijuana with negative results." Glenn Decl., Ex. 1 at USA-000029.

Glenn then said that Jones had a suspended driver's license "that he needs to take care of," that Walker had a valid driver's license, and asked "is there anything in the car we need to know about before we go – nothing in the car?" Walker said "no." *Id.* at 06:40-06:51. Officers Glenn and Roberts do not have any discussion about either of them smelling marijuana emanating from the vehicle. The officers did not request defendants' consent to search the vehicle.

Officer Glenn then walked to the car, while Officer Roberts stayed with Walker and Jones. Officer Glenn proceeded to search the car. *Id.* at 07:01. Officer Glenn shined his flashlight throughout the interior of the car, looked on the sides of the seats, rifled through papers and other items inside the car (including Jones' backpack), and opened up and looked through compartments, including the glove compartment and center console. *Id.*

After additional officers showed up,[15] and after Officer Glenn had been searching the vehicle for almost four minutes, Officer Roberts joined Glenn to search the vehicle. *Id.* at 10:53. Officer Glenn told Roberts that he already checked the glove compartment, but to "double check everything." *Id.* at 10:56-11:01. Officer Roberts began to search the vehicle, and he commented that he can "smell marijuana." Mitchell Decl. Ex. C at 9:54. Glenn responded, "that reeks, right?" *Id.* at 9:57; Mitchell Decl. Ex. B at 11:06. Officer Roberts then found the firearm charged in this case underneath a food container on the passenger side floor. Mitchell Decl. Ex. C at 10:13-10:20; Krishnamurthy Decl., Ex. 5 (picture of firearm under food container). According to the government, the officers also found a closed, empty mason jar  marijuana residue and a container with a partially burned marijuana cigarette. Krishnamurthy Decl., Ex. 4 (pictures of items); *see also* Glenn Decl. Ex. 1 at USA-000029 (Incident Report stating that Glenn "found several empty containers that smelled of marijuana.").

Officer Glenn then walked over to where Jones and Walker were being detained and said, "You know what happened, bro. Same thing I just asked you about, come on." Mitchell Decl. Ex. B at 11:44-11:46. Jones asked, "What happened?", and then Officer Glenn arrested him. *Id.* at 11:47-11:53. Jones continued to ask why he was being arrested and "what happened?" and Glenn

---

[15] At some point earlier in the stop, the officers called for backup.

told him that they would discuss it at the police station. *Id*. at 12:34-12:43.

Several minutes after the arrest, Officer Glenn called his sergeant. *Id* at 19:07. Officer Glenn reported that they had arrested two individuals and that the car was parked on private property and would need to be towed. Glenn also told the sergeant, "So, they pulled into this parking lot for this hotel, and as we were driving by, the manager like, they were about to pull out, then they saw us, that we had made the block around, and so they were back-backing into the spot, so we kinda pulled in because the manager was looking at us, and he's like 'what's going on, why is this car here?' and we asked the manager if they were guests, and he said 'I don't think so,' so then we stared, the guy jumps out of the car, so we start talking to him, and then we run the other guy, and he's fourteen six with a suspended driver's license, so all in all, a bunch of suspicious behavior was afoot, and they parked in a handicapped spot." *Id*. at 19:10-20:31.

Officers Glenn and Roberts transported Jones and Walker to San Francisco Police Department, Central Station. At the station, Jones was questioned and he told Sergeants Manning and DeJesus that he found the gun in a brown paper bag in the Tenderloin neighborhood when he was on his way to work. Krishnamurthy Decl. Ex. 3. Walker denied that the gun was his and denied knowing that the gun was in the vehicle. *Id*.

Sergeant Manning prepared a "Chronological of Investigation." Mitchell Decl. Ex. D (Dkt. No. 54-1). That report states, *inter alia*, that at 5:45 a.m. on January 9, 2018, he arrived at the station and that he and Sergeant DeJesus were briefed by Officers Glenn and Roberts. The Chronological states,

- Officers inform us that they conducted a traffic stop on a white Ford Fusion.
- During the traffic stop the officers discovered that the drivers of the vehicle Jones had a suspended driver's license and was arrested on the scene.[16]
- During an inventory search of the vehicle officers discovered a loaded semi-automatic firearm under the front passenger seat of the Fusion.

---

[16] As the officers' body cam footage shows, while Jones was ultimately arrested on the scene, he was not immediately arrested upon the discovery of the suspended license (and indeed even after that was discovered, officers said he could go if all okay). Instead, the officers arrested Jones arrested after they discovered the firearm during the search of the Ford.

. . .

*Id*. at USA-000015.

On January 10, 2019, the grand jury returned an indictment with forfeiture allegations charging defendants with a single count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## V.   Walker's status with the Bureau of Prisons at the time of the stop/search

At the time of the stop and search, Walker was still serving the custodial portion of the sentence imposed in *United States v. Walker*, CR 10-772-SI.[17]  Walker was living at RRC Taylor Street Facility, a halfway house.  The government has submitted Walker's furlough application, in which he agreed,

> I am authorized to be only in the area of the destination shown above [address of RRC Taylor Street Facility] and . . . I understand that my furlough only extends the limits of my confinement and that I remain in the custody of the Attorney General of the United States.  If I fail to remain within the extended limits of this confinement, it shall be deemed as escape from the custody of the Attorney General, punishable as provided in Section 751 of Title 18, United States Code. . . .

Krishnamurthy Decl., Ex. 7.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  When a search is conducted without a warrant, the analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  For example, because there is a lesser expectation in the

---

[17]  In Case CR 10-722, a jury convicted Walker of one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).  Judge Conti sentenced Walker to 108 months imprisonment to be followed by three years of supervised release.  Dkt. No. 85 in CR 10-722.  On December 5, 2019, Walker was charged with violating the terms of his supervised release by committing a commercial burglary on November 5, 2019.  Dkt. No. 108.  Case CR 10-722 SI was reassigned to the undersigned on December 31, 2019.

privacy of one's vehicle than of one's person, a warrantless search of a vehicle may be conducted if there is probable cause to believe the vehicle contains contraband. *United States v. Ross*, 456 U.S. 798, 799 (1982). The government bears the burden of establishing that a warrantless search was reasonable and did not violate the Fourth Amendment. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied,* 510 U.S. 900 (1993) (citations omitted).

## DISCUSSION

Defendant Jones moves to suppress all fruits of the warrantless seizure of his person and the search of the Ford Fusion, including but not limited to, the firearm found in the car and any statements that he made after his arrest. Defendant Walker also moves to suppress "evidence from his detention, arrest and search of his person and automobile." Def. Walker's Mtn. at 8 (Dkt. No. 55). Defendants contend that there was no reasonable suspicion to support the initial seizure during the traffic stop. Defendants also argue that even if there was reasonable suspicion to support the initial seizure, the officers unconstitutionally prolonged the stop by conducting tasks unrelated to the traffic stop. Defendants also contend that there was no probable cause to support the search of the vehicle pursuant to the automobile exception.[18]

### I.    Reasonable suspicion for initial seizure[19]

Defendants contend, and the government does not dispute, that defendants were seized within the meaning of the Fourth Amendment at the time that the officers blocked the exit to the

---

[18] Because the search of the vehicle was described as an "inventory search" on Sergeant Manning's Chronological, defendants' motion papers argued that the search was not a permissible inventory search. The government's opposition does not attempt to justify the search as an inventory search, and instead asserts it was permissible under the automobile exception. Thus, defendants' reply briefs are the first time defendants have addressed that argument.

[19] In its papers, the government contended that Walker lacked standing to challenge the initial seizure/traffic stop "because prisoners in full custody have no Fourth Amendment protections, [and thus] neither do residents of half-way houses who are still serving their custodial terms." Gov't Opp'n at 5 (Dkt. No. 62). At the hearing, however, the government appeared to back away from that broad assertion and stated it was no longer contending that Walker was not protected by the Fourth Amendment and that he did in fact have standing to challenge the seizure, but that the initial seizure/traffic stop was justified as a traffic stop.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

parking lot of the Redwood Inn and approached defendants. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, "'by means of physical force or show of authority,'" terminates or restrains his freedom of movement, "through means intentionally applied.") (internal citations omitted).

The government defends the seizure as a valid traffic stop. Police officers may conduct a traffic stop when they have reasonable suspicion to believe that a motorist has committed a traffic violation. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *see also United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005) ("*Whren* and *Lopez–Soto* require that the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations.").[20] "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *Lopez-Soto*, 205 F.3d at 1105.

The government contends that the officers had reasonable suspicion to believe that Jones had committed a violation of California Vehicle Code § 22107 for making an unsafe lane change. The government asserts that when Jones merged over three lanes to pull into the Redwood Inn parking lot, the Ford Fusion narrowly missed hitting the patrol car and that a vehicle behind the patrol car had to brake and honked. Jones argues that he did not commit a traffic violation and he asserts that there is a factual dispute requiring an evidentiary hearing. Jones cites his declaration, in which he states that prior to merging he "looked in my rear view mirror to see if any cars were behind me. There were not; only the SFPD patrol car to my right." Jones Decl. ¶ 6.

The Court is not persuaded that there is a factual dispute requiring an evidentiary hearing. Officer Glenn stated in both his Incident Report and the declaration submitted to this Court that when the Ford Fusion merged three lanes, the vehicle narrowly missed the patrol car and caused the vehicle behind the patrol car to slam on its brakes and honk its horn. *See* Mitchell Decl. Ex. A at

---

[20] In *Lopez-Soto*, the Ninth Circuit held that the Supreme Court's decision in *Whren* did not change the settled rule that reasonable suspicion is sufficient to support an investigative traffic stop. *See Lopez-Soto*, 205 F.3d at 1104.

USA-000029 (Incident Report); Glenn Decl. ¶¶ 5-6 (Dkt. No. 63). Although Jones states in his declaration that "I braked to allow the SFPD car to pass me on the right side, and then I turned on my blinker, merged three lanes over, and pulled into the Redwood Inn parking lot," Jones does not state that the Ford Fusion did not narrowly miss the patrol car when merging. In addition, although Jones states that there were no cars "behind me," he does not state that there were no cars behind the patrol car.

The Court concludes that the government has met its burden to show that the initial seizure of defendants was permissible insofar as the officers had reasonable suspicion to believe that Jones had committed a traffic violation. Defendants do not dispute that Jones crossed over three lanes to pull into the parking lot, and Officer Glenn's Incident Report and declaration state that defendants' car narrowly missed hitting the patrol car and that another vehicle was forced to slam on its brakes and honk as a result of the Ford Fusion's movements.

## II. The traffic stop was unduly prolonged

"Traffic stops are 'presumptively temporary and brief.'" *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). "The vast majority of roadside detentions last only a few minutes." *Berkemer*, 468 U.S. at 437. The Supreme Court held that a traffic stop "seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1615 (2015). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. The Court held that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop[,]" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. To conduct tasks connected to an unrelated criminal investigation, an officer must have independent individualized reasonable suspicion to support the unrelated criminal investigation activities. *Id*. at 1615-16; *Gorman*, 859 F.3d at 715 ("Police simply may not perform

unrelated investigations that prolong a stop unless they have 'independent reasonable suspicion justifying [the] prolongation.'").  The government has the burden of production of coming forward with "specific and articulable facts" to support reasonable suspicion.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Willis*, 431 F.3d at 715 n.5 (on motion to suppress evidence based on traffic stop, stating that the government has the burden of production to come forward with specific and articulable facts to support reasonable suspicion, and defendant has the ultimate burden of proof).

Defendants contend that even if the officers had reasonable suspicion for the traffic stop, the officers impermissibly prolonged the traffic stop by calling and waiting for backup, asking for Walker's identification, running ex-felon records checks on Jones and Walker,[21] removing Jones from the car, and searching the vehicle.  Defendants argue that all of these tasks are unrelated to the mission of the traffic stop, and that they unlawfully prolonged the traffic stop.

The Court concludes that although the officers may have had reasonable suspicion to justify the traffic stop, once the officers detained defendants in the parking lot, they conducted numerous tasks unrelated to the traffic stop that prolonged the traffic stop, such as calling for backup, questioning Walker and Jones about why they were in the Redwood Inn parking lot and whether there was any contraband in the vehicle.  The Court finds it significant that although the record supports a finding of reasonable suspicion to justify the traffic stop, the officers never mentioned the alleged traffic violation to defendants (even when the defendants asked what they had done wrong), and instead the officers immediately began to question Walker and Jones about matters unrelated to the alleged traffic violation.  These activities, as well as calling for backup and directing

---

[21] It is unclear precisely what type of records check the officers ran on defendants.  At the hearing, the government stated that the officers ran a "criminal history" check on defendants. Defendants' supplemental briefing characterizes these checks as "ex felon" checks.  The cases have seemingly drawn a distinction between a criminal history check and a non-routine "ex felon" check, and have also distinguished between the types of checks that can be run on drivers versus passengers. *Compare Gorman*, 859 F.3d at 712 ("routine" criminal history check) *with United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (ex-felon registration check is not routine); *see also United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (officers impermissibly extended traffic stop by demanding passenger's identification as "[t]he identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle.").  In any event, the Court need not determine whether the particular records checks conducted here were routine or necessary to officer safety because the government does not dispute that the officers conducted at least some activities unrelated to the mission of the traffic stop, and those activities unquestionably extended the duration of the traffic stop.

14

Jones to get out of the car and sit next to Walker, significantly prolonged the "traffic stop," and they were unrelated to the mission of the traffic stop. *See Gorman*, 859 F.3d at 715 (questioning motorist about matters unrelated to traffic infraction was beyond the scope of stop's mission and instead was "impermissibly aimed at detecting evidence of ordinary criminal wrongdoing") (internal quotation marks and citation omitted); *Evans*, 786 F.3d at 786 (law enforcement impermissibly extended a traffic stop by asking questions unrelated to traffic safety and unsupported by separate reasonable suspicion).

Indeed, at the hearing the government conceded that the officers conducted some tasks – such as questioning defendants about why they were at the hotel and Officer Glenn asking Walker about whether there was contraband in the car – that were unrelated to the mission of the traffic stop, and that those tasks prolonged the traffic stop. However, the government asserts that there was independent reasonable suspicion to justify those activities, namely the "the smell of marijuana emanating from the car and the Ford's evasive movements." Opp'n at 8 (Dkt. No. 62). Thus, unless the officers had reasonable independent suspicion to justify the unrelated tasks, the seizure was unconstitutional.

### III. The officers lacked independent reasonable suspicion to prolong traffic stop or probable cause to support search of vehicle pursuant to automobile exception

The government contends that the same facts support reasonable suspicion to conduct investigative activities unrelated to the mission of the traffic stop and probable cause to search the vehicle. Specifically, the government argues that the Ford's "evasive movements" and the smell of unburned marijuana emanating from the car provided reasonable suspicion for the officers to question Walker and Jones and prolong the traffic stop, and that the Ford's evasive movements and the smell of unburned marijuana provided probable cause to believe that the Ford contained contraband, thus justifying the search of the vehicle pursuant to the automobile exception.

"[A]n officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion," which "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized*

suspicion." *Evans*, 786 F.3d at 788 (emphasis in original). The reasonable suspicion analysis looks "at whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Reasonable suspicion must be based on more than an officer's 'inchoate and unparticularized suspicion or hunch.'" *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (quoting *Terry*, 392 U.S. at 27).

The Supreme Court has held that police may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132, 162 (1925); *see also United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("[Police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime. . . . 'Probable cause to search is evaluated in light of the totality of the circumstances.'") (citations omitted).

### A. Odor of unburned marijuana

The government argues that the officers had reasonable suspicion to prolong the traffic stop and probable cause to search the vehicle because the officers could smell the odor of unburned marijuana emanating from the car. The government contends that although California has decriminalized the possession of small amounts of marijuana, possession of marijuana is still illegal under federal law, and thus the officers could rely on the smell of marijuana to believe that the vehicle contained contraband.

Defendants dispute as a factual matter whether either officer smelled marijuana emanating from the car prior to the search, and they argue that the body cam footage and other evidence is inconsistent with two officers who smelled marijuana during a traffic search. *See generally* Jones' Reply at 8-10. Defendants also contend that even if the officers did smell unburned marijuana from the car, that fact does not provide reasonable suspicion or probable cause to believe that the car contained contraband after the passage of Proposition 64.

Proposition 64, passed in November 2016, decriminalized the possession of less than 28.5 grams of marijuana by persons 21 years or older. *See* Cal. Health & Safety Code § 11357(b)(2). Proposition 64 changed California law to provide that "[c]annabis and cannabis products involved

in any way with conduct deemed lawful by this section are not contraband nor subject to seizure, and no conduct lawful by this section shall constitute the basis for detention, search or arrest." Cal. Health & Safety Code § 11362.1(c).

District courts in this District have split on the question of whether, after the enactment of Proposition 64, the odor of marijuana alone supports probable cause to search a vehicle. *Compare United States v. Martinez*, Case No. 17-CR-00257-LHK, 2018 WL 3861831, at *5 (N.D. Cal. Aug. 14, 2018) (marijuana odor alone provides probable cause after Proposition 64), *with United States v. Maffei*, Case No. 18-CR-00174 YGR, ___ F. Supp. 3d ___, 2019 WL 5102611, at *7-10 (N.D. Cal. Oct. 11, 2019) (after Proposition 64, marijuana smell alone does not provide probable cause to believe contraband is in vehicle). *Martinez* and *Maffei* are both on appeal before the Ninth Circuit Court of Appeals, and argument is scheduled in *Martinez* for March 3, 2020.[22]  Thus, the Ninth Circuit will soon address the precise question presented here, namely whether the odor of marijuana may justify a warrantless search of a vehicle under the automobile exception.

The Court agrees with the reasoning and analysis of Judge Gonzalez Rogers in *Maffei*, and for the same reasons set forth in her order, the Court concludes that even if the officers smelled unburned marijuana emanating from the Ford Fusion, that smell did not provide either reasonable suspicion or probable cause to believe that there was contraband in the Ford Fusion.  After Proposition 64, California law now explicitly provides that "[c]annabis and cannabis products involved in any way with conduct deemed lawful by this section *are not contraband* nor subject to seizure, *and no conduct lawful by this section shall constitute the basis for detention, search or arrest*."  Cal. Health & Safety Code § 11362.1(c) (emphasis added).  Officers Glenn and Roberts are San Francisco Police Department officers charged with enforcing California law, not federal law, and the Court is not persuaded by the government's arguments that notwithstanding the passage of Proposition 64, the officers could rely on the smell of marijuana alone to search the car because marijuana is illegal under federal law.

---

[22]  *See U.S. v. Martinez*, No. 18-10498, https://www.ca9.uscourts.gov/calendar/view.php?caseno=18-10498.

Further, the government does not assert – and there is no evidence – that there are any other objective, specific facts that the officers relied upon to believe that the defendants had contraband in the car. For example, the officers did not see any drugs or drug paraphernalia in plain view (California Health & Safety Code § 11362.3(a)(4) prohibits transporting open containers of cannabis or cannabis products while driving).[23] Similarly, the government does not assert that the officers believed that Jones was driving under the influence of marijuana (which would be a crime, *see* Cal. Health & Safety Code § 11362.3(a)(7)), and indeed the officers did not ask Jones any questions about whether he had used marijuana nor did they conduct a field sobriety test.

## B. "Evasive" movements of the Ford Fusion

The government also argues that the "evasive" movements of the Ford Fusion provided reasonable suspicion. The government relies on *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), for the proposition that "nervous behavior is a pertinent factor in determining reasonable suspicion." The government argues, "[t]he officers saw the car cut through three lanes to drive into a parking lot that the defendants had no business stopping in, and then drive back into that same parking lot as soon as they saw the officers. The officers' observations were confirmed by the hotel manager at the time, and Walker's own admissions." Gov't Opp'n at 10. The government asserts that "[t]his 'obvious attempt[] to evade officers'" supports reasonable suspicion. *Id.* (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

Defendants respond that the car's movements were not evasive and in any event could not provide a particularized basis for suspecting wrongdoing. Defendants argue that the car's movements – turning into a hotel parking lot and reversing into a parking space – are far from an "obvious attempt to evade officers," and defendants note that *Brignoni-Ponce* involved the factually

---

[23] The government relies upon this Court's decision in *United States v. Collins*, Case No. 16-CR-00244 SI, 2018 WL 306696 (N.D. Cal. Jan. 5, 2018), to argue that the smell of marijuana provides probable cause to search a vehicle. *Collins* is distinguishable in several respects. Importantly, the traffic stop and vehicle search occurred on February 25, 2016, prior to the passage of Proposition 64. *Id.* at *1. Further, when the officers stopped Collins, they saw "a digital scale on the front passenger seat next to [Collins'] child, and 'a significant quantity of marijuana . . . in plain view in a clear plastic bag near the front center console . . . . The marijuana was within arms-reach of the child." *Id.*

distinct circumstances of a traffic stop in a border area.  *See id.* at 885 ("Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area.").  Defendants also assert that the government has not shown that defendants "had no business" at the hotel, and they note that Victor, the hotel employee, told officers that he did not know whether defendants were hotel guests or not.

Defendants also argue that even if the government could show that Jones' car movements were "evasive," the Court must consider the surrounding context of the encounter before determining that the movements support a finding of reasonable suspicion (or probable cause), and that specifically the Court must consider the issue of race.  Defendants cite *United States v. Brown*, 925 F.3d 1150, 1156 (9th Cir. 2019), in which the Ninth Circuit stated, "In evaluating flight as a basis for reasonable suspicion, we cannot totally discount the issue of race."  "Flight can be a problematic factor in the reasonable suspicion analysis because some citizens may flee from police for their safety," particularly black male citizens who bear the disproportionate "burden of aggressive and intrusive police action."  *Id.*  In *Brown*, the Ninth Circuit held that the police did not have reasonable suspicion to stop the defendant based on an anonymous tip provided through a 911 call.  The anonymous tipster had reported that a young black male of medium build with dreadlocks, a camouflage jacket, and red shoes, was carrying a gun.  *Brown*, 925 F.3d at 1151.  Officers on patrol heard and responded to the 911 call, and they saw Brown on foot and determined that he matched the 911 description.  The officers followed Brown for several blocks, called for backup, and after the officers turned on their patrol lights, Brown ran.  The officers chased Brown, ordered him to the ground at gunpoint, handcuffed him, and found drugs and a weapon on him.

The district court denied Brown's motion to suppress and the Ninth Circuit reversed.  The Ninth Circuit noted that "the Supreme Court has never endorsed a per se rule that flight establishes reasonable suspicion. Instead, the Court has treated flight as just one factor in the reasonable suspicion analysis, if an admittedly significant one."  *Id.* at 1154.  The Ninth Circuit held,

> [I]n the face of a weak tip, this case presents little more than a black man walking down the street in Belltown, which the government does not argue is a "high crime" area.  There is no evidence that Brown was in an area known for unlawful gun possession, unlike the "heavy narcotics trafficking area" in *Wardlow*, nor did the officers observe Brown holding something or walking in a particular way that would

corroborate the information that he might be carrying a gun. Brown did not refuse to speak with the officers after a verbal request. Although Brown's flight might be suggestive of wrongdoing, it did not corroborate any reliable suspicion of criminal behavior.

*Id*. at 1156. The Ninth Circuit continued,

> In evaluating flight as a basis for reasonable suspicion, we cannot totally discount the issue of race. In explaining his understanding of the limits of the Court's opinion in *Wardlow*, Justice Stevens recognized that flight can be a problematic factor in the reasonable suspicion analysis because some citizens may flee from police for their safety. *See Wardlow*, 528 U.S. at 126–140, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Several years before Justice Stevens' concurrence, our court addressed at length "the burden of aggressive and intrusive police action [that] falls disproportionately on African-American, and sometimes Latino, males" and observed that "as a practical matter neither society nor our enforcement of the laws is yet color-blind." *Washington v. Lambert*, 98 F.3d 1181, 1187–88 (9th Cir. 1996). There is little doubt that uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement.
>
> In the almost twenty years since Justice Stevens wrote his concurrence in *Wardlow*, the coverage of racial disparities in policing has increased, amplifying awareness of these issues. This uptick in reporting is partly attributable to the availability of information and data on police practices. Although such data cannot replace the "commonsense judgments and inferences about human behavior" underlying the reasonable suspicion analysis, *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673, it can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise. *See id*. at 133, 120 S.Ct. 673 ("Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices." (footnote omitted)). Given that racial dynamics in our society—along with a simple desire not to interact with police—offer an "innocent" explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion, we are particularly hesitant to allow flight to carry the day in authorizing a stop.

*Id*. at 1156-57 (internal footnote omitted);

Jones argues,

> Mr. Jones and Walker—two black men—were driving in the very-white Marina District of San Francisco, past midnight, on a weeknight, after a police car tailed them for several blocks. Perhaps Mr. Jones and Walker, uncomfortable by the police following them, and motivated by "a simple desire not to interact with police," decided to turn off the road. *Brown*, 925 F.3d at 1156. Essentially validating defendants' worry that they looked out of place because of their skin color, the government assumes—without citation or justification—that Mr. Jones's car "dr[o]ve into a parking lot that the defendants ha[d] no business stopping in." Gov't reply at 10. The government has presented no evidence whatsoever that the men "had no business" in the hotel parking lot. Moreover, it was their right to do so—whether they were hotel guests or merely wanted to avoid a police encounter.

Jones' Reply at 7 (Dkt. No. 67).

The Court agrees with defendants and finds that the government has not met its burden to

show that the officers had a "particularized and objective basis for suspecting legal wrongdoing," as opposed to an "inchoate and unparticularized suspicion or hunch." Even if the movements of the Ford Fusion could be characterized as "evasive," that does not provide a particularized basis for believing that the defendants had engaged in any criminal conduct. Further, the Court "cannot totally discount the issue of race," *Brown*, 925 F.3d at 1156. Without anything more specific to indicate that defendants had engaged in criminal conduct, the Court finds that "evasive" driving does not provide a particularized and objective basis to permit the officers to prolong a traffic stop by investigating criminal conduct unrelated to the traffic stop.

The Court notes that Officer Glenn's declaration does not provide any information about what specific criminal conduct[24] the officers suspected defendants were engaged in, nor do the officers' Incident Reports contain such information. The Court is troubled by the fact that from the very inception of the stop, the officers (and Officer Glenn in particular) questioned defendants about what they were doing, their criminal history, why they were at the parking lot, and whether there was anything illegal in the car. Indeed, it would be fair to characterize the entire "traffic stop" as a seizure during which the officers investigated matters unrelated to the alleged traffic violation. The statements made by the officers are compelling evidence that the officers were acting on an unparticularized suspicion or hunch that there was something "a little weird" going on, as opposed to having a particularized and objective basis to believe that the defendants had engaged in criminal conduct. *See* Mitchell Decl. Ex. B at 02:37-58. The officers repeatedly stated that they were trying to "figure out what's going on" and "make sure everything's good" and "make sure everything's on the up and up." *Id*. at 00:49-58, 02:37-02:58; Mitchell Decl. Ex. C at 03:01-03:07.

In sum, the Court concludes that under the totality of the circumstances, the officers did not have reasonable suspicion to prolong the traffic stop, nor did they have probable cause to search the vehicle, even if the movements of the Ford Fusion could be characterized as "evasive" and even if the officers smelled unburned marijuana emanating from the car. The "evasive" movements of the

---

[24] Officer Glenn does not say in his declaration that he and Roberts believed defendants possessed a criminal amount of marijuana in the vehicle. The government's opposition brief argues that the officers could smell the odor of unburned marijuana emanating from the car, and that this provided reasonable suspicion and probable cause. The Court addresses that argument *infra*.

car did not provide a particularized basis for believing that the defendants had engaged in any criminal conduct. Following passage of Proposition 64, the smell of unburned marijuana – without any other facts such as seeing marijuana in plain view or suspecting the driver of having smoked marijuana prior to driving – does not provide a basis to believe that the defendants possessed contraband in their car.[25]

## IV.     Defendants' expectation of privacy in the car

The government contends that neither defendant had a reasonable expectation of privacy in the Ford Fusion and thus that they cannot challenge the search of the vehicle. The government frames this question as one of standing. "[T]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. United States*, 439 U.S. 128, 131 n.1 (1978); *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The Supreme Court has recently instructed that "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

### 1.     Jones

The government contends that Jones did not have a legitimate expectation of privacy in the Ford Fusion because the car was rented by Walker's mother, Walker's mother did not give him permission to drive, Jones did not have a valid driver's license, and Jones was driving the car for a short period of time with Walker in the car the entire time. The government argues that these facts show that Jones did not lawfully possess or control the Ford Fusion, and thus that he did not have a

---

[25]  In the event that the Ninth Circuit holds that the smell of unburned marijuana alone can provide probable cause to search a vehicle, the Court will hold an evidentiary hearing regarding whether officers detected the odor of unburned marijuana emanating from the vehicle prior to the search of the car.

legitimate expectation of privacy in the car. In support of these arguments, the government largely relies on cases outside the Ninth Circuit. *See, e.g.*, *United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019) (holding the defendant did not have a reasonable expectation of privacy when he was driving a rental car because he was both an unauthorized driver and because he had a suspended license: "Lyle should not have been driving any car because his license was suspended, and a rental company with knowledge of the relevant facts certainly would not have given him permission to drive its car nor allowed a renter to let him do so. Under these circumstances, Lyle did not have a reasonable expectation of privacy in the rental car."); *United States v. Almeida*, 748 F.3d 41, 45, 47-48 (1st Cir. 2014) (holding the non-owner defendant, who had driven the car previously but who was a passenger during the stop and search, did not have a reasonable expectation of privacy in the car).

In *Byrd v. United States*, the Supreme Court held that "as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." 138 S. Ct. at 1524. The government asserts, "Significantly, however, the Supreme Court did not hold that an unauthorized driver of a rental car necessarily has standing," and it cites Justice Alito's concurrence in which he wrote,

> Relevant questions bearing on the driver's ability to raise a Fourth Amendment claim may include: the terms of the particular rental agreement; the circumstances surrounding the rental; the reason why the driver took the wheel; any property right that the driver might have had; and the legality of his conduct under the law of the State where the conduct occurred.

*Id*. at 1531-32 (Alito, J., concurring). The Supreme Court held that an unauthorized driver of a rental car could have a legitimate expectation of privacy if the driver had "lawful possession and control and the attendant right to exclude," and where the Supreme Court noted that "there may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it – perhaps the renter is drowsy or inebriated." *Byrd*, 138 S. Ct. at 1528-29.

Jones argues that under *Byrd* he has a legitimate expectation of privacy in the vehicle. Jones also argues that *Lyle* is not binding on this court, and he notes that the Second Circuit in *Lyle* expressly stated that its holding differed from the approach of the Ninth Circuit in *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006). *See Lyle*, 919 F.3d at 729-30 ("[U]nlike the Eighth and

Ninth Circuits, which have held that a defendant may have standing to challenge the search of a rental car despite lacking a valid license and authorization under the rental agreement if he received an authorized driver's permission, *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998); *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006), we conclude that an authorized renter's permission is not determinative of whether a defendant has a reasonable expectation of privacy.").

In *Thomas*, the Ninth Circuit held that "an unauthorized driver who received permission to use a rental car and has joint authority over the car may challenge the search to the same extent as the authorized renter." 447 F.3d at 1199. The driver in *Thomas* had tried to rent the car from the rental agency but the agency refused to rent to him because he had unpaid fees, and then another individual rented the car and gave Thomas permission to drive the car. *Id*. at 1194-95. When police officers stopped Thomas, he provided a driver's license bearing the name of an another individual. *Id*. at 1195. The officer searched the car and found, among other items, cocaine and heroin. In the district court, Thomas moved to suppress the evidence seized in the search of the rental car. The district court denied the motion on the ground that "an unauthorized driver of a rental car has no expectation of privacy, so Thomas lacked standing to challenge the search." *Id.* at 1196.

The Ninth Circuit reversed, holding that "an authorized driver may have standing to challenge a search if he or she has received permission to use the car." *Id*. at 1199.[26] The court framed the relevant inquiry as "whether an unauthorized driver has a possessory or ownership interest in the car," and stated that "[a] 'possessory or ownership interest' need not be defined narrowly: A reasonable expectation of privacy may be shown 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. at 1197-98 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "[A] defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control'

---

[26] The *Thomas* court stated that it was adopting the approach of the Eighth Circuit, which had held that an unauthorized driver "would have standing after a showing of 'consensual possession' of the rental car," which could be satisfied by "a showing of 'a more intimate relationship with the car's owner or a history of regular use of the car.'" *Thomas*, 447 F.3d at 1197, 1199 (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam)).

or 'common authority' over the property searched." *Id.* at 1198 (citing *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980) (holding non-owner has standing to challenge a search where he has "permission to use his friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner")). The Ninth Circuit found that on the facts of that case, Thomas had not shown that he, in fact, had the permission of the renter to drive the car, and thus he could not challenge the search.

The Court concludes that under the totality of the circumstances, Jones had a reasonable expectation of privacy in the Ford Fusion. Jones and Walker are cousins, and the car was rented by Walker's mother/Jones' aunt. *See Thomas*, 447 F.3d at 1197 (indicating that relationship between driver and owner/renter is relevant to determining expectation of privacy). Walker's mother gave Walker permission to drive the car, and Walker asked Jones to drive because he was tired. *See Byrd*, 138 S. Ct. at 1528-29 ("there may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it – perhaps the renter is drowsy or inebriated."). At the time of the stop and seizure, Jones was driving with the permission of Walker, and Jones had possessions in the vehicle (such as his backpack, which was searched). Before the police approached the vehicle, Walker exited the car, leaving Jones with sole possession of the car and its keys. *See Portillo*, 633 F.3d at 1317. Jones had "complete dominion and control over" the car at the time of the stop and seizure. The Court acknowledges that Jones did not have a valid driver's license, and this fact does somewhat diminish the reasonableness of Jones' expectation of privacy. However, as Jones notes, the driver in *Thomas* also did not have a valid driver's license. The Court concludes that notwithstanding his suspended license, under all of the circumstances, Jones had a reasonable expectation of privacy in the car that he was driving when the officers conducted the stop and search.

Further, even if Jones did not have a reasonable expectation of privacy in the car, he can still challenge the search of the vehicle as the fruit of the unlawfully prolonged seizure. In *United States v. Twilley*, 222 F.3d 1092 (9th Cir. 2000), the Ninth Circuit held that a passenger "who has no expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car . . . may challenge a stop of a vehicle on Fourth Amendment grounds even if she has no

25

possessory or ownership interest in the vehicle." *Id.* at 1095 (internal citations and quotation marks omitted). The Ninth Circuit held that "while Twilley does not have standing to challenge the search directly, if the defendant could establish that the initial stop of the car violated the Fourth Amendment, then the evidence that was seized as a result of that stop would be subject to suppression as 'fruit of the poisonous tree.'" *Id.* (internal citation and quotation marks omitted); *see also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667, 672 (7th Cir. 2018) (where traffic stop was lawful at its inception but unlawfully prolonged and passenger lacked standing to directly challenge search of vehicle, holding passenger could nevertheless could challenge search of vehicle as fruit of the unlawful seizure and affirming district court's suppression order).

### 2. Walker

The government raises a different challenge to Walker's expectation of privacy in the rental car. The government contends that "Walker lacks standing to contest the search of the car because someone who is 'wrongfully on a premises [can] not move to suppress evidence obtained as a result of searching them.'" Opp'n at 5 (quoting *Rakas v. Illinois*, 439 U.S. 128, 141 (1978)). The government notes that at the time of the stop and search, Walker was still serving the custodial portion of the sentence imposed in *United States v. Walker*, CR 10-772-SI, and the government asserts that Walker had failed to "remain within the extended limits of []his confinement." Krishnamurthy Decl., Ex. 7. The government has submitted Walker's furlough application to RRC Taylor Street Facility, in which he agreed,

> I am authorized to be only in the area of the destination shown above [address of RRC Taylor Street Facility] and . . . I understand that my furlough only extends the limits of my confinement and that I remain in the custody of the Attorney General of the United States. If I fail to remain within the extended limits of this confinement, it shall be deemed as escape from the custody of the Attorney General, punishable as provided in Section 751 of Title 18, United States Code. . . .

*Id.* The government has also submitted a copy of a "Center Discipline Committee Report," from the Federal Bureau of Prisons, which states that Walker was found to have been in an "unauthorized vehicle" (among other charges, including "possession of weapon") based upon the events of January 8-9, 2018, and that he was disciplined as a result. Krishnamurthy Decl., Ex. 8. As noted *supra*, at

the hearing the government appeared to back away from its assertion that because Walker was serving the custodial portion of his sentence at a halfway-house, he was akin to an inmate who does not have any Fourth Amendment protections.[27]  However, the government continued to argue that because Walker was not authorized to be in the car, he did not have a reasonable expectation of privacy in the car such that he can challenge the search of the vehicle.

Walker contends that he had a reasonable expectation of privacy in the Ford Fusion.  Walker notes that he was authorized to work at On-Trac located in South San Francisco, and that at the time of the stop he was on his way to work.  Walker notes that while he was disciplined, he was never determined to be on escape status or determined to have absconded from custody.  Walker also notes that he returned to the halfway-house at the appointed hour (by 10:30 a.m.), albeit after having been in police custody for much of the time allotted for work.  Walker argues that all of the cases cited by the government are factually distinguishable in that they involved escapees and fugitives.

The Court concludes that Walker had a reasonable expectation of privacy in the vehicle and thus he can challenge the search of the car.  Walker's mother rented the vehicle and gave him permission to drive it.  At the time of the seizure and search, Walker had authorization to leave the halfway house to go to work, and he was in fact on his way to work when defendants were stopped.  Further, for the same reasons stated above with regard to Jones, even if Walker did not have a

_____

[27] To the extent the government does make such an assertion, the Court rejects it.  In *Samson v. California*, the Supreme Court stated that "parolees have fewer expectations of privacy than probationers."  547 U.S. 843, 850 (2006); *see also United States v. Johnson*, 875 F.3d 1265, 1275 (9th Cir. 2017) ("on the continuum of state-imposed punishments, parolees appear to hold the most limited privacy interests among people convicted of a crime but are not actually imprisoned") (internal quotation marks omitted).  Here, Walker was completing his custodial sentence in a halfway-house, and his status is similar to a parolee.  Although the Supreme Court in *Samson* held that parolees have limited privacy interests and could be subjected to suspicionless searches, the Court noted that "an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee."  *Samson*, 547 U.S. at 856 n.5.  The Court also rejected the dissent's criticism that the majority was equating parolees with prisoners.  *See id*. at 850 n.2 ("Nor, as the dissent suggests, do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights.  That view misperceives our holding.  If that were the basis of our holding, then this case would have been resolved solely under *Hudson v. Palmer*, [holding traditional Fourth Amendment analysis of the totality of the circumstances inapplicable to the question of whether a prisoner had a reasonable expectation of privacy in his prison cell], and there would have been no cause to resort to Fourth Amendment analysis.").  Thus, *Samson* recognized that a parolee does not lose all Fourth Amendment protection, and that context matters.

reasonable expectation of privacy in the vehicle because he was not authorized to be in it, he nevertheless can challenge the search of the vehicle as a result of the unlawfully prolonged traffic stop.  *See Twilley*, 222 F.3d at 1095; *Rodriguez-Escalera*, 884 F.3d 661 at 672.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motions to suppress.

**IT IS SO ORDERED**.

Dated: February 10, 2020

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California